**UNITED TANKS, INC., and Bell Toptex, Inc., Plaintiffs,**

v.

**SEARS ROEBUCK & CO., Defendant.**

Civ. A. No. 66–879.

United States District Court
C. D. California.

May 16, 1968.

Cullen, Sloman & Cantor, Bernard J. Cantor, Detroit, Mich., for plaintiffs.

Fulwider, Patton, Rieber, Lee & Utecht, Warren L. Patton, Los Angeles, Cal., for defendant.

## FINDING OF FACT
### and
## CONCLUSIONS OF LAW

BYRNE, District Judge.

This action having been tried upon the facts by the Court without a jury, the Court does hereby find the facts and state its conclusions of law thereon, pursuant to Rule 52(a), F.R.Civ.P., as follows:

*Jurisdiction:*

1. This being a patent infringement action filed March 26, 1966 in accordance with the Patent Laws of the United States, Federal jurisdiction is based upon 28 U.S.C. § 1338(a). This Court has jurisdiction over both the subject matter and all the parties hereto.

*Plaintiffs:*

2. Plaintiff, UNITED TANKS, INC., is a corporation of the State of California, having its principal place of business at Alhambra, California.

3. Plaintiff, BELL TOPTEX, INC., is a corporation of the State of California, having its principal place of business at Long Beach, California.

*Defendants:*

4. Defendant, SEARS ROEBUCK AND COMPANY, is a New York corporation, having a regular established place of business at 2650 East Olympic Boulevard, Los Angeles, California.

5. The defense of this action is and was controlled and conducted by AMERICAN SAFETY EQUIPMENT CORPORATION OF MICHIGAN, having its regular and established place of business at 2400 Fisher Building, Detroit, Michigan, the manufacturer of the accused infringing products who has admittedly sold same within the Central District of California and elsewhere within the United States. Said AMERICAN SAFETY EQUIPMENT CORPORATION OF MICHIGAN, has submitted itself to the jurisdiction of this Court and is bound by the outcome of this litigation.

*Nature of Action:*

6. The single cause of action herein alleges infringement of Claims 1 and 14 through 18 of United States Letters Patent No. 2,625,683. Defendants have denied infringement and validity of such patent and have Counterclaimed for a Declaratory Judgment, under 28 U.S.C. § 2201, of non-infringement and invalidity.

*Patent-in-suit:*

7. The patent-in-suit, No. 2,625,683, relating to a crash helmet was issued to the patentees Herman P. Roth and Charles F. Lombard on January 20, 1953 and based upon an application filed in the United States Patent Office on December 8, 1947. By assignment, the Plaintiffs herein have been and are the owners of said patent.

8. Claims 1 and 14–18, the only claims-in-suit, are reproduced below:

Claim 1: In a flyer's crash helmet, the combination of an outer shell, an outer layer inside and adjacent the outer shell of energy-absorbing substantially inelastic material capable on impact of deforming and offering a resistance to such deformation, absorbing and dissipating a considerable impact force, and an inner layer lining the said outer layer composed of a material having considerable resiliency, said helmet having a cavity within the same constructed so as to fit substantially to the shape and size of the flyer's head.

Claim 14: Protecting means for reducing the effect of an impact force upon a portion of the human body, including a rigid wall and a liner within and adjacent the wall including a material functioning to crush, and deform under the action of said force, thereby limiting the transmitted force to an amount tolerable to the body, said material being substantially inelastic so that it will substantially maintain its deformed state, and thereby reduce said force; in combination with means for containing and enveloping said protecting means.

Claim 15: A protection device for protecting a portion of a human body from an impact force, which comprises a relatively hard outer shell and a layer of non-resilient, crushable, energy-absorbent material within the outer shell operating to maintain its deformed state after being subjected to the said force, and capable of limiting the transmitted force to an amount tolerable in the body.

Claim 16: A protection device for protecting a portion of a human body, which comprises a relatively hard outer shell and a layer of non-resilient, crushable, energy-absorbent material within the outer shell, and a lining of soft resilient material within the layer of crushable material.

Claim 17: A crash helmet for protecting a portion of a human head against impact, said crash helmet having a body including a substantially rigid shell, a layer inside and adjacent said shell including a material capable of disintegrating within the layer, and in disintegrating functioning to resist a force of sufficient magnitude to crush and partially deform the same, thereby limiting the transmitted force to an amount tolerable to the human head, said material being substantially inelastic so that it is incapable of storing up the said crushing force and transmitting it.

Claim 18: A crash helmet according to Claim 17 including a liner within said shell, said liner being of an elastic character to adapt itself to the shape of the wearer's head.

9. In essence, the claimed patent monopoly covers a helmet formed of a hard outer shell whose interior is lined with a crushable, non-resilient or inelastic, permanently deformable energy-absorbing material whose function is to absorb and spread impact energies or forces. Although certain of the claims (i e., Claim 1, 16 and 18) also include an inner resilient liner, this element was for all practical purposes disclaimed in the arguments presented to the Patent

Office Examiner, as being non-essential to the invention and relating merely to increased comfort to the wearer. Thus, the inner resilient liner is irrelevant to the claimed invention and has been so treated by both parties during trial.

10. The inventive concept, as described in the patent specification, as argued before the Patent Office Examiner, and as testified to by the patentee Roth, is the discovery that prior art resilient helmet liners were inadequate helmet shock absorbers due to their rebounding after impact so as to release absorbed energy to the wearer's head, and that non-resilient or inelastic helmet liners were better helmet shock absorbers because these permanently deform rather than rebound to thereby non-releaseably absorb impact energy.

11. The specification (Col. 2, lines 3–23) of the patent-in-suit, describes the inventive concept as follows:

"Previously helmets have been constructed employing a relatively rigid or hard outer shell as a means for distributing locally applied force but these helmets have relied either solely on the use of such a hard outer shell or combined such a hard outer shell with an inner lining of resilient material, such as sponge rubber. The helmet of the present invention involves a new concept in the matter of the energy-absorbing liner for the rigid outer shell. When a helmet is constructed with a rigid outer shell with a resilient lining, the resilient lining functions merely to slightly delay the application of the force of the impact to the head of the wearer by temporarily storing and then transmitting the impact energy. The present invention involves the employment of a substantially rigid outer shell and an energy-absorbing layer composed of a non-resilient material which is capable of being crushed under the action of an impact force."

At trial, Roth testified that the foregoing quotation from the specification

of the patent-in-suit was what he believed the patentees invented at that time. Roth further admitted that the prior art German patent No. 707,963 disclosed the same concept, as will be referred to in more detail below.

12. The Patent Office Examiner having at first refused to grant the patent as not distinguishing over certain prior art found by him, the patentees further argued and presented their inventive concept to him, thusly:

> "It is further pointed out that applicants were the first to understand the effect the old style helmet had on the human cranium, i. e., applicants were the first to conceive the inherent unsuitability of the resilient materials." (Defendant's Exhibit B, file wrapper, page 81).

> "No prior patentee suggests that the way to absorb a blow in a helmet is to provide a crushable non-resilient material * * * applicant has certainly made a patentable contribution to the art by the introduction into a crash helmet of non-resilient crushable material * * *". (File wrapper, page 68.)

It was upon this representation that the Patent Office Examiner granted the patent-in-suit.

13. At trial, Plaintiff contended that the inventive concept was first, the use of a shell suitable to spread or distribute the forces of impact and, second, the use of a specific liner material, namely a cellular or foam plastic liner material. As to the first, the patentee Roth admitted, and the Court finds, that such was the purpose and function of all prior art helmets and therefore not a novel inventive concept here. As to the second, Roth admitted that he did not intend to limit himself to any particular kind of material, the patent specification (Col. 5, line 57—Col. 6, line 7) corroborates that the invention is not limited to any particular kind of material, and the claims-in-suit are not expressly limited to any specific material, plastics or otherwise. Not one of the claims-in-suit specifies or is restricted to a plastic or cellular or foam plastic as contrasted with claims *not* in suit, as for example Claims 4 and 5, which do specify a foam plastic material, namely, "cellular-cellulose-acetate". Hence, the Court finds that Claims 1 and 14 through 18 broadly encompass *any* suitable non-resilient, permanently deformable material, and that Plaintiffs are foreclosed from limiting the claims to or reading into the claims limitations as to specific material in order to avoid the prior art.

14. The Court further finds that the claimed invention is the concept of forming the liner of a hard shell helmet out of *any* non-resilient or inelastic material, rather than out of a resilient material, for absorbing energy by permanent deformation.

*Background of Claimed Invention:*

15. Both patentees, Mr. Herman P. Roth and Dr. Charles F. Lombard, who are also Directors of Plaintiff UNITED TANKS, INC., were called by and testified on behalf of Plaintiffs at trial. From their testimony, the following facts were adduced:

16. In early 1946, Lombard while employed by the Department of Aviation Medicine of the University of Southern California, to conduct research in the field of aviation physiology, began a project to design a helmet suitable for pilots flying jet aircraft. Shortly after, in May, 1946, Roth, an experienced engineer in the field of medical type of equipment, was hired to assist in the project. The helmet project was financed by the Aircraft Industries Association, which included various aircraft manufacturers, such as North American Aviation, Lockheed, Douglas, Consolidated-Vultee, Northrup Aviation, etc.

17. In May, 1946, Northrup Aviation requested assistance from the Department of Aviation Medicine in acquiring helmets for three of its test pilots. As a result, with Roth's assistance, Northrup built three helmets which were used thereafter by their pilots, starting in June, 1946, while test flying a new

airplane. Those helmets were made with a fiberglass-plastic hard outer shell lined with a resilient foam rubber liner material which absorbed only a small amount of energy. After they were built, in June or July, 1946, Roth made one or two minor adjustments to the liner thickness to merely improve comfort to the pilot and thereafter, neither he nor Lombard had any further involvement with the Northrup helmets, which were used thereafter for at least one year by the pilots in connection with flying aircraft and which became well known in the industry by the summer of 1946. Roth admittedly did not invent the concept of making the hard shell out of fiberglass, nor the idea of using a lining, which he already knew was necessary and old in any kind of helmet.

18. In July, 1946, as the next step in the helmet project, Roth made a search through available literature, finding the prior art Cairns, British Medical Journal article of 1941, relating to crash helmets, which suggested to him the idea of using an energy-absorbing liner within the hard helmet shell. Roth copied verbatim into his work notes the following portion of the Cairns article:

"Between the outer shell and lining, there is a gap which may with advantage contain some energy absorbing material."

Roth already knew the old, prior art engineering principle that for severe impacts, a shock absorber should be made of a non-resilient, permanently deformable material, rather than of a resilient material. Therefore, since he was concerned with an airplane pilot's helmet, subject to severe impacts, he decided to make the Cairns liner out of a non-resilient material. Thus evolved the patented concept.

19. Roth next turned his attention to locating a suitable, commercially available, non-resilient material. Having read about the then newly available, lightweight, non-resilient cellular or foam plastics, he turned to Brandt Goldsworthy of Industrial Plastics Corporation, the supplier of the Northrup helmet plastic shells, whom he knew to be well versed in the plastic arts, for suggestions as to a suitable non-resilient foam or cellular plastic. Goldsworthy referred him to DuPont's new cellular cellulose acetate (commonly referred to as CCA), foamed polystyrene, and cellular hard rubber. Upon checking these materials, Roth found that of the three available CCA's, the least dense or hard one had the required compressive strength for use as a helmet liner and he thereupon selected that one and rejected all the other materials suggested.

20. The selection of a specific density of CCA from among the available cellular plastics is the only difference between the Cairns article and the patented helmet. However, that difference, namely, the identification of such specific materials is not even given in the specification of the patent, despite knowledge of the patentees at the time the patent application was filed that other available CCA plastics, polystyrene and cellular hard rubber were not so useful. To that extent, the patent specification is deficient in failing to identify the only cellular plastic material then known to the patentees as being useful as an energy-absorbing liner.

21. The Court finds that the concept of the use of a suitable energy-absorbing liner within a hard helmet shell did not originate with the patentees, but rather, was published in the prior art Cairns article which the patentees followed in developing their patented helmet. The concept of using a non-resilient, permanently deformable material as the energy-absorbing means was an old engineering concept, known to Roth as well as the art long prior to the development of the patented helmet. The suggestion of using cellular or foam plastics came to Roth from the prior art literature and the suggestion to use CCA or foam polystyrene came, not from the patentees, but rather from a third party, Goldsworthy.

22. The foregoing steps, while perhaps demonstrating a good, logical,

engineering development of a product, represent only ordinary, routine engineering procedures, namely, studying the available literature to determine the known requirements for the product, then locating suitable available materials and thereafter selecting the best of the available materials to meet the known requirements. The end product, namely, a hard shell helmet lined with a non-resilient, permanently deformable liner material, whether of cellular plastics or of any other comparable substance, was an obvious, logical and expected following of the prior art literature. Hence, the Court finds the claimed invention to have been an obvious engineering extension of, rather than a departure from the foregoing prior art.

*North American Aviation Helmets:*

23. In approximately July, 1946, Roth mentioned his work on the helmet project at one of the regular monthly meetings of a so-called aviation medical group, a group made up of pilots and engineers of the aircraft companies and the aeromedical research department of the University of Southern California. These monthly discussion meetings were conducted without restrictions as to maintaining secrecy. At this meeting, Frank Bolte of North American Aviation indicated that his company would like to get such helmets for its pilots. Thus began the North American Aviation helmets contended by Defendant to be and found by this Court to be a prior public use.

24. With Roth's advice, North American built four helmets in the fall of 1946 for its own pilots. By September 1946, one helmet was built for pilot G. F. Welch and during the fall of 1946, helmets were built for pilots G. W. Krebs, W. Lien, and W. F. Phinzy, who used these helmets in connection with flying airplanes. Welch began using his helmet in September of 1946 in connection with flying aircraft. These helmets had outer shells made of fiberglass laminate, the same as and made by the same company from the same molds, as the earlier

Northrup helmets. The shells were lined with cellular cellulose acetate instead of with the foam rubber of the Northrup helmets. Except for the use of the CCA liner and the method for mounting the pilots' earphones, which is not relevant to this suit, these helmets were the same as the earlier Northrup helmets.

25. Neither Roth nor Lombard placed any restrictions upon North American or its pilots as to the use of the helmets and they were used by the pilots in connection with flying airplanes without restrictions by the patentees. Nor was there any restriction by the patentees upon North American or the pilots' showing the helmets to others during the fall of 1946.

26. There was no evidence of any experimentation or tests conducted upon or in connection with the foregoing North American helmets. The pilots who wore the helmets were testing new airplanes, not helmets. There were no reports from the pilots on the helmets. There was no equipment at the University of Southern California or elsewhere for testing the helmets and no experimental testing was conducted upon them. The patentees believed these helmets to be satisfactory for their intended purpose and the pilots were satisfied with them.

27. Roth testified that the helmets were experimental to the extent of finding out whether or not they were comfortable to wear and that this could have been determined in one or two flights. Lombard testified that these helmets were experimental to the extent of of whether or not they were useful to the pilots in flight. Beyond that, there was no evidence suggesting experimentation upon the helmets. Rather, the testimony was that the pilots did not experiment on helmets, but freely used them in their work of testing airplanes without restrictions by the patentees who had no future contact with such helmets, while the patentees thereafter continued further development in their own laboratory

on improving production techniques for fabricating such helmets.

28. North American Aviation had contributed towards the financing of the helmet project conducted by the patentees, and in that way had pre-paid for the advice and help given to them by the patentees in making the foregoing helmets for their pilots. In essence, North American paid for the information on how to make better helmets for its pilots, and it received from the patentees such information for which it had paid.

29. The Court finds that the patented helmets were publicly used, without restriction, by North American Aviation pilots in connection with their duties in flying airplanes, beginning September, 1946, more than one year before the patent application filing date of December 8, 1947.

*Commercialization:*

30. By October 15, 1946, the patentees attempted to license the patented helmet to the H. I. Thompson Company, a manufacturer of plastic items. Correspondence of that date, as explained by testimony, indicates that the helmet was ready to be patented. Suggestions were then made to the patentees to arrange for the University of Southern California to file a patent application. However, the University did not file such a patent application. In addition, the license attempt was not successful.

31. In the fall of 1946, Consolidated-Vultee approached the patentees seeking two helmets for its pilots like the North American helmets. Two helmets of the patent-in-suit were built by Consolidated-Vultee from information supplied not by the patentees but apparently from North American, further indicating a lack of experimentation or secrecy or other restrictions placed by the patentees upon the North American helmets.

32. Thereafter, some time prior to January 6, 1967, Sperry-Gyroscope Company, Inc., ordered helmets of the pat-

ent-in-suit for its pilots, which helmets were custom built by the patentees to fit Sperry pilots and were supplied to Sperry and paid for in 1947.

33. During 1947, helmets of the patent-in-suit were purchased from the patentees by Boeing Aircraft Company, Douglas, and North American Aviation, for use by their respective pilots, and also helmets were ordered by the U. S. Navy for its pilots. By the beginning of 1948, the patentees set up a separate business to commercially produce and sell the helmets of the patent-in-suit. There was no evidence of any testing or experimentation upon such helmets by the patentees or anyone else prior to December 8, 1947, the filing date of the application for the patent-in-suit, other than work done by the patentees to improve and reduce costs of the manufacturing techniques for commercially fabricating the liner.

34. Word of mouth publicity began with North American pilot Welch's helmet in September, 1946 and continued through 1947. The University of Southern California also publicized these helmets in 1947. There is no evidence that the helmet was maintained in secrecy by the patentees. The evidence is to the contrary, showing open and free disclosure to the aircraft industry, beginning by September 1946, as might well be expected in a project co-sponsored by a university and an aircraft industry association.

*Prior Art:*

35. The prior art British Medical Journal article of October 4, 1941, by Dr. Cairns, previously mentioned above, suggested the use of a liner formed of an energy-absorbing material to be placed inside the hard shell of a motorcycle helmet. This article was not cited by the Patent Office Examiner but was known to and followed by the patentee Roth. It left to Roth only the mechanical task of selecting a suitable available energy-absorbing material. The claims-

in-suit differ from this prior art Cairns article only in the more detailed description of the material selected by Roth pursuant to the Cairns suggestion. Hence, the Court finds the claimed subject matter to be obvious over this prior art.

36. The prior art, German Patent No. 707,963 of 1941, to Filter and Mann, relating to crash helmets for pilots, not cited by the Patent Office Examiner, discloses the same discovery made by the patentees Roth and Lombard, namely, that an elastic or resilient liner material arranged within the hard shell of a pilot's helmet was inadequate to protect against severe impacts because it absorbed only a limited amount of impact energy and elastically transmitted the major portion of the energy. The German patent suggested the use of a non-resilient permanently deformable liner material arranged within the hard shell to absorb or nullify the impact energy by converting it into deformation work. The patentee Roth admitted that the German patent disclosed the same concept as the patent-in-suit, namely, using a non-resilient, permanently deformable, liner material instead of a resilient liner material.

37. The German patent disclosed a corrugated metal web as its non-resilient, permanently deformable liner material, as compared to the more modern, newly available foam or cellular plastic non-resilient liner material disclosed in the specification of the patent-in-suit. However, the selection by the patentees Roth and Lombard of the newly available, more modern cellular or foam plastic material rather than using the old-fashioned corrugated metal for the same purpose, namely, to provide a non-resilient, permanently deformable, energy-absorbing means within the hard shell of a pilot's helmet, was both expected and obvious product engineering work. Selecting the best, most modern available material for a product is normal, routine engineering and considering only the foregoing German patent, that is all the patentees Roth and Lombard can be credited with doing here. Hence, the Court finds the patented helmet in suit to be an obvious following of this prior art German patent.

38. There is no difference between the subject matter of the claims-in-suit and the disclosure of the German patent. However, since the Plaintiffs argued that the claims must be interpreted as restricted to a cellular or foam plastic material, accepting that restriction *arguendo*, the Court finds that the claimed subject matter as so restricted differs from the German patent only in the substitution of a more modern, newly available, energy absorbing material, cellular plastics, for the old-fashioned corrugated metal energy-absorbing material, and this is an obvious following of this prior art patent.

39. The concept of using a non-resilient, permanently deformable, energy-absorbing means, in place of a resilient energy-absorbing means to better absorb and protect against the energies of severe impacts, was not only admitted to be old by the patentee Roth, and not only was demonstrated to be old by the foregoing German patent, but was further demonstrated to be old by the prior art patent to Sturm, U. S. Patent No. 2,275,-573 of 1940. Sturm repeats the old engineering principle that for severe impacts, resilient shock absorbers should be replaced by non-resilient permanently deformable shock absorbs to better absorb or dissipate the impact energy.

40. The concept of using a hard outer shell in constructing a helmet for, among other things, spreading or distributing impact forces was admitted by Roth to be old and to have not been his invention, as was the concept of making the hard shell out of plastic material. Moreover, making the hard shell out of plastic material was demonstrated to be old by Brady, U. S. Patent No. 2,296,335 of 1940.

41. The concept of providing some sort of lining in the inside of the hard shell of a helmet was also admitted by Roth to be old and not invented by him. The antiquity of this concept was further demonstrated by the prior art patents to Elsdon, British Patent No. 10,914 of 1895, Modiano, British Patent No. 356,578 of 1931, and Tress, British Patent No. 332,994 of 1930, all of which disclose liners made of cork material. Modiano, in particular, describes his cork liner as being a shock absorber. Other prior art examples of helmet liners are Reppa, U. S. Patent No. 1,586,701, disclosing a granulated cork liner material, and Brodie, U. S. Patent No. 1,251,959 of 1918, and Hart, U. S. Patent No. 1,483,881 of 1926 which disclose felt liner materials, which Brodie describes as a "buffer" to diminish shock.

42. As demonstrated by both the foregoing prior art as well as the testimony of Roth, cork was an old and well-known helmet liner material. Roth admitted that cork liners absorb energy but not as well as properly selected cellular plastics. The witness Webb, an engineer employee of American Safety, testified that for motorcycles and the like types of crash helmets, liners of properly selected densities of cork would absorb energy about as well as equally properly selected cellular plastics, but that cork was deficient in that, being an imported, natural material, it cost more than and is not as readily available as the synthetic cellular or foam plastic materials, making the modern plastics more desirable as helmet liners than the old-fashioned cork.

43. The prior art recognized the desirability of using foam plastics as a cork substitute or what may be characterized as a synthetic cork. For example, Miles, U. S. Patent No. 2,268,160 of 1941 suggests using cellular cellulose acetate as a substitute for cork and further describes that such plastics may be prepared in various densities and rigidities to suit the specific use for which they are intended.

44. Another prior art example, Alderson, U. S. Patent No. 2,387,730 of 1945 suggests the use of foam or cellular polystyrene and other cellular plastics as a cork substitute for such relevant uses as packaging materials and shock absorbers.

45. Other prior art patents and publications disclose that foam or cellular plastics, such as cellular cellulose acetate, may be made in varying degrees of rigidity or resiliency or non-resiliency, depending upon intended uses and describe the characteristics of such plastics, as for example, Schneider, U. S. Patent No. 2,242,372 of 1942, Taylor, U. S. Patent No. 2,372,695 of 1945, Maier, No. 2,512,468 of May 28, 1946, Modern Plastics Magazine of May 1946, and Modern Plastics Encyclopedia of 1946.

46. The Court finds that substituting the newly available, modern cellular or foam plastic materials, such as cellular cellulose acetate or cellular polystyrene, which were described to the art as being useful as cork substitutes, such as for packaging and shock absorbing, etc., and available in a variety of densities or degrees of resiliency or non-resiliency, depending upon desired uses, was obvious, expected and routine product engineering. Assuming *arguendo*, that the patented claims-in-suit cover the use of foam or cellular plastic materials in place of prior art cork liner materials within a hard shell helmet, that difference, the substitution of cellular plastics for cork, is foreshadowed by the prior art and hence, is obvious mechanical skill rather than invention.

*Defendant's Accused Helmets:*

47. Defendant, AMERICAN SAFETY EQUIPMENT CORPORATION OF MICHIGAN, through its BUCO Division, manufactures and sells a variety of models of crash helmets useful for motorcyclists, policemen, racing car drivers, etc. It does not make pilot's helmets. Defendant uses as its liner

material beaded, cellular polystyrene, a plastic which structurally is similar to cork in that their cell forms are similar, but differs structurally from CCA.

48. Defendant's helmets are made to comply with American Standards Association Z 90.1 standards, one of two nationally recognized standards for this type of helmet, which among other things, requires the helmets to be capable of absorbing the impact of at least two blows at the same spot. Thus, the liner materials used by Defendant are characterized as semi-resilient in that they are not completely resilient, like rubber, nor completely non-resilient. Under impact, such material deforms but partially recovers or rebounds each time. A test conducted by Plaintiffs showed that it took five impacts, the last of substantial magnitude, to "use up" or destroy the effectiveness of the liner material and that after each impact, the material resiliently rebounded or recovered sufficiently to accommodate the next impact. This contrasts with the liner material disclosed and claimed in the patent-in-suit which permanently deforms, is not supposed to rebound or recover at all, or disintegrates (as specified in Claim 17) upon the first blow. The contrast is that of a "one-shot" liner of the patented helmet vs. a "multi-shot" liner used by Defendants.

49. Samples of Defendants' helmets and liners were demonstrated to the Court by the witnesses, and it was clearly shown that at least one type of liner material was quite soft and resilient although more non-resilient than, for example, rubber, while others were more non-resilient, although not completely so. These were compared to samples of cork by the witness Webb who testified that samples of comparably selected cork and Defendant's cellular polystyrene absorbed about the same amount of impact energy, the cellular polystyrene being a little better. At least for Defendant's type of "multi-shot" helmet, cork and beaded cellular polystyrene are substantially equivalent, although the latter is more desirable because less expensive to use

and more readily available. The choice of the particular type of polystyrene plastics used by Defendants is dictated primarily by costs, in turn affected by quantities of production of any particular helmet model, with low production dictating manual fabrication and thus a type plastic which is more easily worked by hand, and high production dictating a type plastic which is more readily machine molded.

50. The same not being necessary to determination of this suit, the Court makes no finding as to infringement of the claims-in-suit by the Defendant's helmets.

*The Skill of the Art:*

51. The various prior art documentary exhibits, the Court's observations of the witnesses Roth, Lombard and Webb, demonstrate that the workers in the helmet art are highly skilled, highly literate, and commonly refer to and rely upon the literature of the art. The high skill of the art is no better demonstrated than by the fact that the patented helmet was developed under the auspices of a well-known university in a department devoted to aviation medicine. At the time, Roth, an engineer with an undergraduate degree in chemical engineering and a Master's degree in biological sciences and engineering, had many years of experience in sophisticated medical equipment. Dr. Lombard holds a Bachelor's degree in physics and a Ph.D. in medical sciences and was a researcher and teacher in aviation physiology. The relevant art encompasses mechanics, biology, chemistry, physiology, and the like technical subject matters. Hence, the Court finds the level of skill of the relevant art to be high.

CONCLUSIONS OF LAW

1. Claims 1 and 14 through 18 of United States Letters Patent No. 2,-625,683 are invalid and void, under the provisions of 35 U.S.C. § 102(b), because the subject matter thereof was in public use within the United States more than one year prior to the date of the application of said patent.

2. Claims 1 and 14 through 18 of United States Letters Patent No. 2,-625,683 are invalid and void, under the provisions of 35 U.S.C. § 103, because not only the subject matter thereof, but also the differences between the patented subject matter and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains.

3. Defendants are entitled to an injunction against Plaintiffs and those in privity with them, asserting infringement of said Patent No. 2,625,683 against Defendants, their customers, suppliers, and those in privity with Defendants.